**Supreme Court**

No. 2011-341-Appeal.
No. 2012-202-Appeal.
No. 2012-203-Appeal.
(WC 08-415)

Jody King                    :

    v.                    :

Huntress, Inc.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2011-341-Appeal.
No. 2012-202-Appeal.
No. 2012-203-Appeal.
(WC 08-415)

|                 |     |
| --------------- | --- |
| Jody King       | :   |
| v.              | :   |
| Huntress, Inc.  | :   |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** This case is a federal maritime action[1] in which Jody King, the plaintiff, raised claims for maintenance and cure; negligence under the federal Jones Act, as codified in 46 U.S.C. § 30104; and "breach of the warranty of seaworthiness."[2] On June

---

[1]     Although the law of the sea is essentially federal in nature, the Rhode Island state courts have jurisdiction over this federal maritime action pursuant to the "saving to suitors" clause set forth in 28 U.S.C. § 1333(1). Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222 (1986) ("The saving to suitors clause leaves state courts competent to adjudicate maritime causes of action * * * .") (internal quotation marks omitted); see Benders v. Board of Governors for Higher Education, 636 A.2d 1313, 1316 (R.I. 1994). However, the rare involvement of our courts in such matters is cause for understandable uncertainty in its application by both trial justices and attorneys.

[2]     Many of the filings by the parties referenced in this Court's discussion have headings which use all capital letters, are underlined, or employ bold-face type. We have conformed those headings to our usual style throughout this opinion.

1, 2011, after a trial in Washington County Superior Court in which plaintiff prevailed on his claim for maintenance and cure, but not on his claims for negligence and breach of the warranty of seaworthiness, the trial justice denied the motion for a new trial filed by the defendant, Huntress, Inc., with respect to the claim for maintenance and cure and granted the motion for a new trial filed by the plaintiff with respect to the claims for negligence and breach of the warranty of seaworthiness. The defendant appeals that decision,[3] contending that the trial justice erred in: (1) denying the defendant's motion for a new trial on the claim of maintenance and cure because the trial justice, sua sponte, gave what the defendant considers to be an improper instruction to the jury with respect to "unearned wages;" (2) granting the plaintiff a new trial on the issues of negligence under the Jones Act and breach of the warranty of seaworthiness because, in the defendant's view, the trial justice "overlooked" and "misconstrued" testimony, resulting in a decision which was "clearly wrong;" and (3) applying Rhode Island's prejudgment interest statute, as codified in G.L. 1956 § 9-21-10, as opposed to the principles of general federal maritime law pertaining to prejudgment interest.

For the reasons set forth in this opinion, we vacate the trial justice's denial of defendant's motion for a new trial with respect to the claim for maintenance and cure. We likewise vacate the trial justice's grant of plaintiff's motion for a new trial on the claims of negligence under the Jones Act and breach of the warranty of seaworthiness. Additionally, we conclude that the trial justice's reliance upon Rhode Island's prejudgment interest statute was in error.

---

[3]    We note that plaintiff also filed a cross-appeal in this case. However, in his brief to this Court, plaintiff chose not to address any issues raised in his cross-appeal; consequently, we likewise shall not address them. See Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I. 2002) (stating that, when a party fails to properly brief an issue for this Court's review, it "constitutes a waiver of that issue"); see also Carrozza v. Voccola, 90 A.3d 142, 149 n. 10 (R.I. 2014).

# I

## Facts and Travel

On May 29, 2008, plaintiff filed a complaint in Washington County Superior Court, against defendant; the allegations in the complaint related to the injuries sustained by plaintiff in an accident which took place on May 31, 2006 on board a commercial fishing vessel owned by the defendant corporation. The complaint contained a claim for maintenance and cure[4] (Count One); a claim for negligence under the federal Jones Act (Count Two); and a claim for breach of the "warranty of seaworthiness" (Count Three). In due course a trial was held over seven days in November of 2010.[5] We summarize below the salient aspects of what transpired at that trial.

## A

### The Testimony at Trial

#### 1

#### The Plaintiff's Witnesses

##### i. The Testimony of Plaintiff [6]

The plaintiff testified at trial that he worked as a "[d]eckhand" on a commercial fishing vessel named Persistence; he added that he received payment for his first "fishing trip" on the Persistence on March 12, 2005 and on several subsequent trips until his last trip on April 3, 2006.

---

[4] "[M]aintenance and cure" are defined as "[c]ompensation provided to a sailor who becomes sick or injured while a member of a vessel's crew." Black's Law Dictionary 1039 (9th ed. 2009).

[5] During pretrial proceedings, defense counsel argued that the issue of prejudgment interest in a federal maritime case falls within the discretion of the jury. The trial justice suggested that defendant submit a proposed jury instruction to that effect. However, upon a review of the record, there is nothing to indicate that defendant ever submitted such a proposed instruction.

[6] We are aware that plaintiff was not the first witness to testify; but, in the interest of clarity, we believe it helpful to recount the relevant aspects of his testimony at the outset.

It was his testimony that during that time period he went on multiple fishing trips and earned approximately $54,000. When asked how he "would * * * know who was going on * * * the next trip," it was Mr. King's testimony that he would do "boat duty to follow the trip that [he] just finished and Kyle [Goodwin][7] would make the list out and determine who was going on that trip and who was going to stay on shore."

According to Mr. King's testimony, on May 31, 2006, he arrived at the Persistence for "boat duty" (because the vessel was in between fishing trips), and he was assigned painting duty. He stated that he was assigned to paint the "coaming,"[8] which was located "in between the second and third floor hatch;" Mr. King further explained that the coaming was on the ceiling of the "fish hold deck" and on the floor of the room above (the "packing room"). It was his testimony that he placed a "stepladder" on the "cement floor of the fish hold;" he added that he "didn't believe [the stepladder] was on a slant." He indicated in this testimony that, as he reached the second rung of the stepladder, it "seemed to come out from underneath [him] and [he] fell" to his left. When asked if he knew why the stepladder came out from underneath him, he responded: "No. I do not." It was also his testimony that, after he fell, but on the same day as the fall, he noticed that the stepladder had "two deep gouges or cuts" on the "bottom rung."

Mr. King testified that after the fall he experienced pain in his left arm from his "wrist all the way to [his] shoulder," but he said that he "attempted to continue to finish [his work that] day." He added that he had never seen a stepladder "lashed" or "blocked" on the Persistence and that he had never observed a "spotter" being employed. According to his testimony, he was

---

[7] The plaintiff testified that he considered Kyle Goodwin to be his "employer" when he went aboard the Persistence. Kyle Goodwin is not to be confused with Glenn Goodwin, whose testimony we discuss infra.

[8] "Coaming" is defined as "[a] raised rim or border around an opening, as on a ship's deck, designed to keep out water." The American Heritage Dictionary of the English Language 353 (5th ed. 2011).

- 4 -

ultimately diagnosed with a "large rotator cuff tear" in his left shoulder. He further testified that he underwent two surgeries on his left shoulder to repair the rotator cuff. When asked at trial about his expenses, his testimony indicated that the cost of his mortgage and utilities was approximately $37 per day, while his expenses for food were approximately $15 per day. He acknowledged that defendant had made payments to him for "maintenance" and had also paid him what he characterized as an "advance," but he added that those payments stopped in February of 2008. The plaintiff contends that the maintenance payments should not have been halted because, as Dr. Gary Perlmutter testified at his deposition, plaintiff did not reach his "maximum medical end result" until March 9, 2010.[9] Albert Sabello, a "vocational rehabilitation counselor," testified at trial that, due to the injury to plaintiff's left arm, he would not be able to return to work as an offshore fisherman; he stated that the duties of a fisherman were "beyond [plaintiff's] physical ability for lifting, using manual motor coordination, [and] dexterity."

On cross-examination, plaintiff testified that, after he positioned the stepladder on the day of the accident, it was "as level as it could possibly be," but he acknowledged that the floor of the fish hold was "pretty rutted" and had a "tiny * * * bow." He further testified that, if one of the other individuals working on the Persistence that day saw something wrong with the placement of his stepladder, that person "should have said something" to him.

### ii. The Testimony of Christopher Weisensee

Christopher Weisensee testified that he was a "[d]eckhand" working on the Persistence on the day that plaintiff fell. He further stated that the vessel was tied up at the dock on that day;

---

[9] According to plaintiff's testimony, Dr. Gary Perlmutter was his treating physician when he underwent a second surgery to repair the tear in his rotator cuff. As plaintiff states in his brief, Dr. Perlmutter's videotaped deposition was played for the jury at trial. The transcript of Dr. Perlmutter's deposition reflects that, by March 9, 2010, he considered plaintiff to have reached his "maximum medical end result" and concluded that "no further treatment was warranted."

and, when he was then asked if the vessel moved back and forth when tied to the dock, he responded: "Not noticeably usually." It was Mr. Weisensee's testimony that the captain made the decision as to who would go on each fishing trip; he stated that the captain "picks who he feels deserves to go." It was his further testimony that the composition of the crew was not the same from trip to trip.

Mr. Weisensee testified that he was working with plaintiff in the fish hold on the day of plaintiff's fall. He stated that he was about twenty feet away from plaintiff and that he saw him place the stepladder on a "slant" because the fish hold was not "completely straight in all areas." At trial, he claimed that he had not seen plaintiff climb the stepladder or fall from it; he explained that, although he had said in his deposition that plaintiff was on the second step of the stepladder when he fell, he had merely "assumed" that plaintiff was on the second step "based on how much time it took at the time." During cross-examination, he clarified the latter statement by testifying that "two or three" seconds elapsed between the moment when he "glanced" over and saw plaintiff setting up his stepladder and the eventual fall. According to Mr. Weisensee's testimony, plaintiff fell to his left.

Mr. Weisensee also stated that setting up the stepladder on a slant was "not smart." However, he explained that he did not say anything to plaintiff about the slanted stepladder—not because he did not "care," but rather because he did not know that plaintiff was going to "climb up and hurt himself." He then acknowledged that in his deposition he had stated:

> "We're in harm's way all the time. Somebody's doing something stupid, they're just being stupid. I don't really care. It's not my problem. Go hurt yourself. I don't care. It's not my problem."

On cross-examination at trial, Mr. Weisensee testified that, when he saw plaintiff setting up the stepladder on a slant, he thought that plaintiff would use his own judgment and not climb a slanted stepladder.

### iii.    The Testimony of David Reposa

David Reposa testified that he was working on the Persistence as a "deckhand" on the day in question; he added that the vessel was "[t]ied to the dock." According to his testimony, Mr. Reposa was above plaintiff on the "mid-deck," about fifteen to twenty feet away from plaintiff at the time of the fall. His testimony indicated that he could see Mr. King through an open central hatch. He testified that he was painting, and he added that there was "sufficient ventilation" so that there were not any "dangerous vapors." He further stated that the paint was not making his eyes "red and glossy." However, plaintiff's counsel confronted him with his deposition testimony, in which he had stated that the paint vapors were "kind of" making his eyes red and glossy. It was further his testimony that, when plaintiff fell, he was carrying "his paint brush and his container in his hands * * * ." He testified that plaintiff climbed to the third step and that the stepladder toppled to the right, while plaintiff fell to the left.

### iv.    The Testimony of Allan Feldman

Allan Feldman testified that he was an "emeritus professor" at Brown University, having worked in the Economics Department since 1971. He testified at trial with respect to plaintiff's economic loss. In his testimony he explained that he projected lost income for plaintiff as a fisherman at $54,500 per year for the four and a half years between plaintiff's injury and the trial. It was his further testimony that that resulted in his calculating the "total lost earnings over the period starting in the year 2006, the date of the accident, through the [date of the trial]" to be

$254,166.  He further testified that he calculated plaintiff's potential earnings "from the end of the current year until the end of [plaintiff's] work life expectancy" to be "$642,836."

### v.    The Testimony of Grant Parker

Grant Parker, a "sea captain" with thirty-five years of experience, who was qualified as an expert, testified that a stepladder was an "inherently unsafe" item to use on a vessel; he added that "a platform ladder" or "a vertical ladder" should have been used.  He further indicated in his testimony that the specific stepladder used by plaintiff on the day of his fall should have been "taken out of service" (i.e., removed from the vessel) because there were "cuts in the bottom rung."  In the course of his testimony, Captain Parker opined that every employee on a vessel has a responsibility to maintain a safe work environment; he stated that the "reasonable prudent seaman" is obligated to "alert [another seaman] that he's standing in harm's way and to remove the hazard or alert the seaman that he's then standing in harm's way and not allow that unsafe act to continue."  He added that crew members should be instructed "about the safe working procedure."  Finally, when asked whether or not he had "an opinion to a reasonable degree of certainty whether the fishing vessel Persistence was a reasonably safe place to work as it lay at the dock on May 31, 2006," he responded as follows: "I would have to say none [sic] due to the ladder condition and the disposition of the seaman not willing to stand and alert his fellow seaman that there's an unsafe condition."

Captain Parker acknowledged on cross-examination that a vessel tied to a dock, as the Persistence was when plaintiff fell, is very stable.

**2**

**The Defendant's Witnesses**

**i.      The Testimony of Glenn Goodwin**

Glenn Goodwin testified that he was "a part owner and the captain of the fishing vessel Persistence;" he added that he was a captain full-time from 1986 to 1994 and thereafter continued to captain the vessel on a part-time basis. He testified that stepladders were used "all the time just to let us do overhead activities, wires being run and painting and all * * * ." When asked whether, "based on [his] experience as a captain on a fishing vessel and the fishing vessel Persistence for 25 years [he] believe[d] that * * * a crewman on a vessel [who] would not come to the aid of a fellow crewman intentionally ha[d] a place on * * * [that] vessel," he responded in the negative. However, when asked if he were to see "someone in the process of setting up a ladder and [he] glanced over and while they were setting it up [he] saw it slanted, would you * * * warn them before * * * you knew they were getting on the ladder," he replied as follows: "When they were setting the ladder up I don't know if I would warn them at that point." Captain Goodwin added that he possibly would not do so because he "wouldn't be really convinced that that was where [the ladder] was going to be used."

**ii.      The Testimony of David Webb and JoAnn Greene**

David Webb testified that he was working as a "deckhand" on the Persistence on May 31, 2006. It was his testimony that on that date the fish hold was "dry;" he added that he was working in the "forward section" of the fish hold on that day and was not "affected" by the paint fumes. He further stated that the vessel was "stationary." It was his further testimony that he had "[m]any times" used the same stepladder that Mr. King was using on May 31, 2006.

JoAnn Greene, a "bookkeeper" for defendant, testified that plaintiff went on "sixty-two and a half percent" of the Persistence's fishing trips from 2005 to 2006; she added that, in the over twenty years that she had worked for defendant, only one crewman (as contrasted with "captains or engineers") had worked beyond the age of fifty.

**B**

**The Jury Instructions, Closing Arguments, and Verdict**

In the course of instructing the jury with respect to the count for maintenance and cure (Count One), the trial justice stated:

> "If Mr. King is entitled to maintenance and cure, then you should also award him unearned wages from the date of Mr. King's injury until the end of the period for which * * * Huntress agreed he would work, that is, when he was serving the ship."

After the jury instructions had been given, but before closing arguments, defense counsel raised an issue concerning the trial justice's instruction on unearned wages; at sidebar, he addressed the trial justice as follows:

> "On the wages you mentioned that he's entitled to maintenance and cure and he's entitled to unearned wages. I'm afraid the jury is – unearned wages and lost wages, unearned wages I think from [plaintiff counsel's] posture -- instructions relate to unearned wages for the trip in which Mr. King, if he was on a fishing trip, so there's no unearned wages."

The exchange at sidebar continued as follows:

> "**[The Court]**: Well, this may be. I don't know what he's going to argue. He is entitled to unearned wages but unearned wages in this context is not lost wages which is what Dr. Perlmutter testified to which is unearned wages until the end of the trip, for instance, until the end of his expected employment. I believe that was the instruction I gave. Unearned is different from the other.
>
> "**[Defense Counsel]**: Understood, I don't want that. I believe the jury may have been confused, unearned wages will be

- 10 -

lost wages because he's not entitled to be employed, simply was not employed.

> "* * *

> "**[Plaintiff Counsel]**: Well, actually relative to medical costs the Court will give a new instruction, I think we agreed on that, relative to unearned wages.

> "**[The Court]**: I'm inclined to do that already, instruct on unearned wages differentiating them from lost wages. The Court is inclined to overrule. Do you wish to be heard?

> "**[Plaintiff Counsel]**: No, your Honor.

> "**[The Court]**: Objection is overruled."

In spite of the trial justice's suggestion in the course of the just-quoted colloquy that he was going to instruct the jury with respect to the difference between lost wages and unearned wages, no such instruction was ever given, even though the trial justice did in fact give some supplemental instructions to the jury.

At the conclusion of closing arguments, defense counsel lodged an objection to that portion of plaintiff counsel's closing argument which dealt with the unearned wages issue. The following exchange took place:

> "**[Defense Counsel]**: I think [plaintiff counsel] knows exactly what I'm going to mention, the fishing wages, the unearned wages during the fishing season is absolutely not the law of admiralty as applies to this case, and there was no fishing season. This is black letter law and this is why I mentioned before I would ask for a Court instruction that --

> "**[The Court]**: On what? On what he said?

> "**[Defense Counsel]**: That he's entitled to unearned wages to the following fishing season.

> "**[The Court]**: That wasn't my instruction. Are you saying that's [plaintiff counsel's] instruction on the law? I told them not to listen to anybody but the Court on the law. How do you like that?

- 11 -

"**[Defense Counsel]**: I would say --

"**[The Court]**: The instructions.

"**[Defense Counsel]**: It's a factual issue. I'm very confident it was a factual issue.

"**[The Court]**: Well, if it was a factual issue it doesn't relate to the instructions at all. Anything else?

"**[Defense Counsel]**: No, that's it. Thanks."[10]

After the jury was sent to deliberate, in the course of discussing the jury instructions and interrogatories with counsel, the trial justice stated that "negligence does not carry with it prejudgment interest in most jurisdictions that I'm aware of. We're only talking about the computations of prejudgment interest which is done by the Court after the verdict." The following ensued:

"**[Defense Counsel]**: Well, if there is a question, you're right. This is – agrees to the Jones Act and goes to unseaworthiness or vice-versa. The Court cannot apply interest though and that was --

"**[The Court]**: Well, why didn't you actually say that when the jury was in the room so I could have corrected the instructions? Now I'm trying to correct the interrogatories. They weren't given separate instructions on interest.

"**[Defense Counsel]**: Your Honor --

"**[The Court]**: And, therefore, you waived it. The verdict form will go as is."

---

[10] On November 29, 2010, after the jury rendered its verdict in the case, the trial justice issued an order "welcom[ing] memoranda from counsel to clarify" issues surrounding the assessment of prejudgment and postjudgment interest. The plaintiff and defendant each filed a memorandum in response to the trial justice's order; those memoranda were filed on December 6, 2010 and December 13, 2010 respectively. On December 15, 2010, plaintiff filed an additional memorandum with respect to interest, to which defendant responded on January 20, 2011.

Thereafter, on November 24, 2010, the jury returned a verdict in plaintiff's favor on Count One (maintenance and cure) in the amount of $257,500. The jury found in favor of defendant on Counts Two and Three (negligence under the Jones Act and breach of the warranty of seaworthiness).

## C

## The Motions for a New Trial

On December 6, 2010, defendant Huntress moved for a new trial on Count One (maintenance and cure); it contended that the trial justice's instruction with respect to unearned wages was improper. It also contended that the jury must have "misunderstood" the court's instruction because it awarded "five times" the amount of damages that plaintiff was seeking for maintenance. (Emphasis in original.) In the alternative, defendant sought a remittitur of the judgment to $30,000—that amount being what defendant argued plaintiff was entitled to for maintenance after his wife's financial contribution to the household was taken into account.

The plaintiff for his part moved for a new trial with respect to Counts Two and Three (negligence under the Jones Act and breach of the warranty of seaworthiness). The plaintiff's counsel recounted the evidence (some of which he claimed was unchallenged) that he believed would support defendant's liability on Counts Two and Three; he then set forth a number of alleged errors, none of which are at issue in this appeal. In a memorandum filed after the court held a hearing on the new trial motions but before it ruled on those motions, plaintiff's counsel argued that "[r]easonable individuals could not have come to the conclusion reached by the jury" with respect to Counts Two and Three and that, therefore, he was entitled to a new trial on those counts.

On January 24, 2011, each party having objected to the other party's motion for a new trial, a hearing was held, at which the parties were given the opportunity to present argument with respect to their respective motions for a new trial as well as the issue of prejudgment interest. With respect to prejudgment interest, plaintiff's counsel argued that the Rhode Island prejudgment interest statute, as codified in § 9-21-10, should be applied; he stated that the act of calculating prejudgment interest was "ministerial," "not discretionary." The plaintiff's counsel further argued that the "status quo" would be preserved if the court were to employ the 12 percent prejudgment interest set forth in § 9-21-10; and, with respect to his "status quo" contention, he stated: "If that is to be disrupted, * * * it is for the defendant to do it, if the defendant seeks to do it. [The plaintiff is] perfectly happy with the status quo being maintained." In contrast, defense counsel contended that the issue of prejudgment interest was a "substantive area of law" and that, "by virtue of the federal common law of admiralty," the awarding of prejudgment interest was properly in "the discretion of the jury." He stated that the rule that prejudgment "interest must be submitted to the jury [was] the accepted rule of admiralty jurisprudence."

At the January 24, 2011 hearing, the trial justice issued a decision from the bench with respect to the issue of prejudgment interest. The trial justice began his decision by stating: "In this case the question before the Court is not a federal question as it is an issue of common law as opposed to statutory law." After distinguishing some of the cases cited by defendant, he ultimately concluded:

> "[T]he twelve percent [interest] rate which must be added by the clerk is not up to the Court to determine. It is procedure and it is a ministerial act * * * more importantly, we don't ask the jurors to place their value judgment on whether or not to apply the twelve percent, that's not what the statute calls for and, therefore, pre-judgment [sic] interest * * * [is] granted pursuant to the statute."

- 14 -

The trial justice reserved decision on the parties' motions for a new trial. Then, on June 1, 2011, he issued an eleven-page order detailing his decision on the motions for a new trial and addressing a motion filed by defendant requesting that he reconsider his decision on prejudgment interest. In order to properly decide the issues presented to us on appeal we must discuss, at some length, the trial justice's June 1 decision on the motions for a new trial.

The trial justice began by addressing defendant's motion for a new trial concerning the issue of maintenance. In compliance with the standard articulated by this Court with respect to motions for a new trial, the trial justice initially reviewed the evidence presented to the fact-finders. He addressed the testimony of plaintiff, Mr. Sabella, Dr. Feldman, and Dr. Perlmutter. With respect to the jury's award of damages for maintenance, he stated:

> "While this is more than the amount calculated by Dr. Feldman, the jury was attentive and considered all of the evidence. It was within its province to consider the extent of Mr. King's harm, and to weigh other factors, such as how many fishing journeys he may have attended, or the varying success of each fishing trip. The jury's result was reasonable."

The trial justice proceeded to discuss defendant's contentions with respect to whether the jury instruction relative to unearned wages was in error. The trial justice pointed out that he had told the parties that "an admiralty personal injury case was novel for a Superior Court trial" and that he had requested that the parties file pretrial memoranda. He added that he did not receive any such memorandum or a request for jury instructions from defendant until the trial was nearly over—even though, according to the trial justice, plaintiff had filed an extensive request for instructions a "week before trial," in which plaintiff included a "request [for] an award for lost

- 15 -

earnings."[11] The trial justice further stated that, with reference to the jury instruction concerning unearned wages, defendant's "objection on 'wages' if it was an objection, was obscure." He continued by referencing Rule 51(b) of the Superior Court Rules of Civil Procedure,[12] which deals with objections to jury instructions; and he then found that defendant had not stated "distinctly the matter to which the party objects and the grounds of the party's objection." (Internal quotation marks omitted.) Accordingly, the trial justice denied defendant's motion for a new trial on the issue of maintenance, stating: "There was no clear explanation or objection. Hence, Huntress cannot assign the instruction as error."

The trial justice then turned to a discussion of plaintiff's motion for a new trial with respect to Counts Two and Three. He noted that, "[w]hile Mr. King presented a significant case on liability it was not iron-clad;" he then proceeded to discuss the testimony of Mr. Weisensee, deeming it "worthy of extensive comment." The trial justice found that, after Mr. Weisensee testified that "Mr. King's ladder was not positioned on a level floor" and that Mr. Weisensee was aware of that fact before Mr. King climbed the ladder, Mr. Weisensee's "demeanor significantly changed and he became uncooperative * * * ." In the view of the trial justice, Mr. Weisensee's

---

[11]    The trial justice added: "No citations were provided to the court regarding how to compute the damages for maintenance, until after the verdict was received and the jury was discharged."

[12]    Rule 51(b) of the Superior Court Rules of Civil Procedure provides as follows:

> "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection. Opportunity shall be given to make the objection out of the hearing of the jury."

- 16 -

"reluctance * * * to respond to questions posed by Mr. King's counsel at the trial" was the reason for portions of his deposition being read into the record. The trial justice made specific reference to the portion of that deposition where Mr. Weisensee stated:

> "We're in harm's way all the time. Somebody's doing something stupid, they're just being stupid. I don't really care. It's not my problem. Go hurt yourself. I don't care. It's not my problem."

Turning next to the testimony of Captain Parker, the trial justice pointed out that Captain Parker testified that "the standard of care is for a seaman to help another seaman in harm's way, and not allow an unsafe operation to continue"—testimony which, according to the trial justice, was not "questioned on cross-examination" and was "acknowledged" by Glenn Goodwin in his testimony at trial. Consequently, in the trial justice's judgment, Mr. Weisensee's "failure to warn violated the standard of care" and "proximately caused the harm" at issue in the case. Accordingly, the trial justice stated that he could not "conclude that Huntress, and its staff, had no negligence at all" because "[a] poorly trained or unfit crew constitute[d] unseaworthiness." The trial justice found that, "[t]o the extent Mr. Weisensee failed to warn and knew he should do so, Huntress was negligent;" he further found that, "[i]f Mr. Weisensee did not know his obligation to warn, then he was inadequately trained for his employment in the fishing industry." The trial justice concluded his analysis of plaintiff's motion for a new trial as follows:

> "In consideration of the testimony of the witnesses regarding the factual events, the expert testimony adduced and the materials submitted as evidence, and the reasonable inferences drawn therefrom, the jury's verdict is against the fair preponderance of the evidence. The verdicts relative to the negligence and unseaworthiness counts failed to do justice or respond to the merits of the controversy. * * * Reasonable minds could not have come to the conclusion reached by the jury. Mr. King's motion for new trial on the issues of negligence and unseaworthiness must therefore be granted." (Internal quotation marks omitted.)

With respect to defendant's motion to reconsider the award of prejudgment interest, the trial justice stated:

> "Again, the Court is stymied as it was never asked to present the issue of interest to the jury, until after the jury was discharged. Each of the attorneys approved the jury verdict form before deliberations. Again, the Court makes the most of a poor situation. Courts rely on attorneys to prepare the Court, propelled by the adversary system."

Accordingly, the trial justice denied defendant's motion requesting the court to reconsider its ruling on the issue of prejudgment interest. On June 17, 2011, defendant filed a notice of appeal.[13]

## II

## Standard of Review

## A

## Motions for a New Trial

The defendant urges this Court to apply what it refers to as the "appellate rule" in reviewing the trial justice's ruling on the motions for a new trial. It is true that we have in the past referred to a principle denominated as the "appellate rule," which we explained as follows:

> "If a trial justice fails to make a specific appraisal of the evidence, then this [C]ourt will apply the appellate rule, in which case the evidence is examined in the light most favorable to the prevailing party to determine if there is any competent evidence that, if believed, would support the jury's verdict." Hefner v. Distel, 813 A.2d 66, 70 (R.I. 2003) (internal quotation marks omitted).

However, in this case, we are unable to say that the trial justice failed "to make a specific appraisal of the evidence." Id. As such, we decline defendant's invitation to apply the

---

[13] After defendant filed a notice of appeal, final judgment was entered on July 25, 2011. The defendant thereafter filed a second notice of appeal on August 11, 2011. The plaintiff filed a cross-appeal on August 15, 2011. This Court then consolidated those three appeals on November 14, 2012.

"appellate rule;" we will apply our usual standard of review with respect to a motion for a new trial.

As we have stated on numerous occasions, in considering a motion for a new trial, the trial justice sits as a "super juror" and is required to "make an independent appraisal of the evidence in the light of his [or her] charge to the jury." Botelho v. Caster's Inc., 970 A.2d 541, 545 (R.I. 2009) (internal quotation marks omitted); see also Candido v. University of Rhode Island, 880 A.2d 853, 856 (R.I. 2005); Pollard v. Hastings, 862 A.2d 770, 777 (R.I. 2004); Barbato v. Epstein, 97 R.I. 191, 193-94, 196 A.2d 836, 837 (1964). When making this independent appraisal, the trial justice must weigh the evidence and assess the credibility of witnesses. Rose v. Cariello, 85 A.3d 618, 622 (R.I. 2014). The trial justice is also free to "reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record." Botelho, 970 A.2d at 545 (internal quotation marks omitted); see also Bajakian v. Erinakes, 880 A.2d 843, 851 (R.I. 2005). If, in the trial justice's independent judgment, "the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions, the trial justice must allow the verdict to stand." Botelho, 970 A.2d at 545; see also Pollard, 862 A.2d at 777. However, if the trial justice were to find that "the verdict [was] against the preponderance of the evidence and thereby fail[ed] to either do justice to the parties or respond to the merits of the controversy, the verdict must be set aside." Botelho, 970 A.2d at 545 (internal quotation marks omitted); see also Gomes v. Rosario, 79 A.3d 1262, 1265 (R.I. 2013).

On appeal, "[i]f the trial justice has carried out the duties required by Rule 59[14] of the Superior Court Rules of Civil Procedure and our decided cases, his or her decision is accorded great weight by this Court" and "his or her determination either granting or denying a motion for new trial will not be disturbed unless * * * [he or she] has overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." Botelho, 970 A.2d at 546; Pantalone v. Advanced Energy Delivery Systems, Inc., 694 A.2d 1213, 1216 (R.I. 1997); see also Pollard, 862 A.2d at 777; Morrocco v. Piccardi, 713 A.2d 250, 253 (R.I. 1998); Kurczy v. St. Joseph Veterans Association, Inc., 713 A.2d 766, 770 (R.I. 1998).

**B**

**Jury Instructions**

In addition to the motions for a new trial at issue in this case, our review of defendant's contentions on appeal also requires us to evaluate an instruction given to the jury by the trial justice; we evaluate such an instruction on a de novo basis. Oden v. Schwartz, 71 A.3d 438, 450 (R.I. 2013); see also State v. Ros, 973 A.2d 1148, 1166 (R.I. 2009); State v. Graham, 941 A.2d 848, 855 (R.I. 2008). In instructing a jury, the "trial justice fulfills his or her obligation to charge the jury properly by framing the issues in such a way that the instructions reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to support." Morinville v. Old Colony Co-operative Newport National Bank, 522 A.2d 1218, 1222 (R.I. 1987) (internal quotation marks omitted). We examine a jury instruction given by the trial

---

14      Rule 59(a) of the Superior Court Rules of Civil Procedure provides in pertinent as follows:

> "A new trial may be granted to all or any of the parties and on all or part of the issues for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in the courts of this state."

justice in its entirety, rather than examining "single sentences or selective parts of the charge in isolation, * * * [outside of] the context in which they were rendered." Botelho, 970 A.2d at 545 (internal quotation marks omitted); see also Parrella v. Bowling, 796 A.2d 1091, 1101 (R.I. 2002). In conducting our review, we are mindful of the fact that "[t]he reading [of the jury instruction] was not presented to a meeting of the bar association. It was given to a group of laymen." Baccari v. Donat, 741 A.2d 262, 264 (R.I. 1999) (internal quotation marks omitted); see also Neri v. Nationwide Mutual Fire Insurance Co., 719 A.2d 1150, 1153 (R.I. 1998). Additionally, "even if an instruction is erroneous, reversal is warranted only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." Botelho, 970 A.2d at 545 (internal quotation marks omitted); see also State v. Lynch, 19 A.3d 51, 58 (R.I. 2011); Hodges v. Brannon, 707 A.2d 1225, 1228 (R.I. 1998).

## C

### Prejudgment Interest

With respect to the issue of prejudgment interest, we shall review in a de novo manner the trial justice's decision to apply the Rhode Island state statute governing prejudgment interest. See In re Volkswagen and Audi Warranty Extension Litigation, 692 F.3d 4, 13 (1st Cir. 2012) ("We * * * review choice of law issues de novo."); Robidoux v. Muholland, 642 F.3d 20, 22 (1st Cir. 2011) ("Choice of law determinations are questions of law, which we * * * review de novo."); Torre v. Brickey, 278 F.3d 917, 919 (9th Cir. 2002) ("Whether state or federal law applies to a particular issue in a diversity action is a question of law which we * * * review de novo."); see also Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009) ("This Court * * * uses a de novo standard to review a trial justice's rulings on questions of law.").

## Analysis [15]

### A

### Count One—Maintenance and Cure

#### 1

#### Waiver

In ruling on defendant's motion for a new trial, the trial justice called into question the adequacy of defendant's objection to the unearned wages instruction that was included within the trial justice's instructions on maintenance and cure. The plaintiff for his part contends that defendant waived any argument relative to the unearned wages instruction given to the jury because it failed to adequately object to the instruction at trial; defendant disagrees, contending that its objection was "clearly sufficient to preserve the issue."

Under Rule 51(b), "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." The rationale underlying this rule is that it is necessary to "allow the trial justice an opportunity to make any necessary corrections to his or her instructions before the jury begins its deliberations." DiFranco v. Klein, 657 A.2d 145, 147 (R.I. 1995); see also A. R. Alvernas, Inc. v. Cohen, 420

---

[15]  We deem it important to note that, after our extensive review of the record in this case and the applicable case law, we are left with the impression that, at several junctures, there was a profound misunderstanding of the law to be applied amongst the attorneys in this case and/or a failure to inform the trial justice of the applicable law in a cogent and timely manner. Consequently, there was on some occasions an understandable lack of certainty on the part of the trial justice as to the appropriate principles of law to be applied. We would urge the parties, on remand, to endeavor to provide the trial justice with a more timely and thorough discussion of the federal law to be applied in this case. See generally Bajakian v. Erinakes, 880 A.2d 843, 848 n. 7 & n. 8 (R.I. 2005).

A.2d 78, 81 (R.I. 1980). While we are "especially rigorous in the application of the raise-or-waive rule when considering objections to jury instructions," Botelho, 970 A.2d at 548, we nonetheless "will not apply Rule 51(b) in an overly stringent manner," DiFranco, 657 A.2d at 147; moreover, we have stated that "no particular formality is required of counsel in raising an objection." A. R. Alvernas, Inc., 420 A.2d at 81. However, the objection must be "specific enough to alert the trial justice as to the nature of [the trial justice's] alleged error." Botelho, 970 A.2d at 548 (internal quotation marks omitted); see also DiFranco, 657 A.2d at 147. "[T]he purpose of the specificity requirement is to give the trial justice a chance to remedy any deficiency in the charge while there is still a meaningful opportunity to effectuate such a remedy." Botelho, 970 A.2d at 548 (internal quotation marks omitted).

It will be recalled that, in the course of objecting to the jury instruction on unearned wages before the jury left the courtroom to deliberate, defense counsel stated:

> "On the wages you mentioned that he's entitled to maintenance and cure and he's entitled to unearned wages. I'm afraid the jury is – unearned wages and lost wages, unearned wages I think from [plaintiff counsel's] posture -- instructions relate to unearned wages for the trip in which Mr. King, if he was on a fishing trip, so there's no unearned wages.
>
> "* * *
>
> "I believe the jury may have been confused, unearned wages will be lost wages because he's not entitled to be employed, simply was not employed."[16]

While defendant's objection was not a model of proper syntax, it nonetheless made reference, several times, to the contention that the "unearned wages" instruction was in error and may have resulted in the jury being "confused;" in our judgment, the objection had enough "meat on the

---

[16] The defendant also objected, at the conclusion of closing arguments, to that portion of plaintiff's closing argument which referenced the unearned wages issue.

bone" to have put the trial justice on notice as to what defendant contended was "the nature of [the trial justice's] alleged error." Botelho, 970 A.2d at 548 (internal quotation marks omitted). Moreover, it would seem that the trial justice understood the essence of defendant's objection because he stated in response: "I'm inclined to do that already, instruct on unearned wages differentiating them from lost wages."[17] Accordingly, it is our opinion that defendant did not waive his contentions with respect to the trial justice's unearned wages instruction.

**2**

**Maintenance and Cure—Jury Instruction**

In order to put the contentions of the parties on the claim for maintenance and cure[18] in their proper context, we deem it necessary to begin with a discussion of the law with respect to admiralty actions for maintenance and cure.

This Court has stated, in its sole opinion dealing with the matter, that "the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued." Tavares v. Dewing, 33 R.I. 424, 437-38, 82 A. 133, 138 (1912). While we have not had frequent occasion to opine either on admiralty issues generally or on causes of action for maintenance and cure in particular, our review of federal case law has unearthed a plethora of cases dealing with maintenance and cure, to which we now turn for guidance.

---

[17] We are aware that, in actuality, the trial justice never gave a further instruction "on unearned wages differentiating them from lost wages."

[18] It should be noted that cure was not at issue in the case; plaintiff acknowledged that defendant had fulfilled its obligation with respect to cure by paying for plaintiff's medical expenses in their entirety.

- 24 -

"From time immemorial, the law of the sea has required shipowners to ensure the maintenance and cure of seamen who fall ill or become injured while in service of the ship." Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 454 (1st Cir. 1996) (internal quotation marks omitted); see LeBlanc v. B.G.T. Corp., 992 F.2d 394, 397 (1st Cir. 1993); see also 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 6-28 at 505 (5th ed. 2011) (stating that a ship owner's obligation to pay maintenance and cure for an injured seaman "is of ancient vintage"). The right to maintenance and cure is "largely without regard to fault," Ferrara, 99 F.3d at 454 (internal quotation marks omitted); maintenance and cure are "due without regard to the negligence of the employer or the unseaworthiness of the ship."[19] Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979); see Plesha v. M/V Inspiration, 419 F. Supp. 2d 67, 71 (D. P.R. 2006); see also 1B Benedict on Admiralty § 42 at 4-5 (7th rev. ed. 2012) ("Fault concepts are alien to the maintenance and cure remedy * * * ."). A seaman "may forfeit his entitlement only by engaging in gross misconduct." Ferrara, 99 F.3d at 454 (internal quotation marks omitted).

Maintenance refers to the "provision of, or payment for, food and lodging," while cure provides for the payment of "any necessary health-care expenses * * * incurred during the period of recovery from an injury or malady." Ferrara, 99 F.3d at 454 (internal quotation marks omitted); see also Whitman v. Miles, 387 F.3d 68, 71 (1st Cir. 2004). The right to receive maintenance and cure extends until such time as the seaman reaches "maximum medical recovery." Whitman, 387 F.3d at 72 (internal quotation marks omitted). Such maximum medical recovery occurs when the seaman is "so far cured as possible"—meaning that the

---

[19] The right of a seaman to recover "maintenance and cure for illness or injury occurring while he is in the service of the ship is often analogized to workmen's compensation." Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, ch. VI, § 6-6 at 281 (2d ed. 1975).

seaman is either fit to work or his or her "condition has stabilized and further progress ended short of a full recovery * * * ." Id. (internal quotation marks omitted); see Plesha, 419 F. Supp. 2d at 71; see also Ferrera, 99 F.3d at 454.[20]

The defendant posits that the jury's award of $257,500 for maintenance was "nearly five * * * times more than [Mr.] King's own best evidence of $54,000 and five * * * times the amount [Mr.] King's counsel demanded of the jury." It contends that the reason for that discrepancy is the fact that the trial justice issued, sua sponte, a jury instruction on unearned wages within the maintenance and cure instructions; according to defendant, such instruction was "legally incorrect as [Mr.] King was not entitled to unearned wages under established black letter law."[21] It is the view of defendant that unearned wages are available on a maintenance claim only if the "seaman is employed under a contract for a specific period of time[] or * * * when a seaman becomes ill or injured during a voyage." (Emphasis in original.) It is defendant's contention that: (1) Mr. King can produce no "contract, written, oral or otherwise, requiring him to serve or requiring [defendant] to hire him for any particular trip, let alone a specific duration;" and (2) that, consequently, he is not entitled to unearned wages. The defendant further posits that the unearned wages instruction essentially (and incorrectly in defendant's view) told the jury that "if they awarded maintenance and cure, th[en] they should award unearned wages * * * ." (Emphasis in original.) It avers that, given what it contends was

---

[20]     For further authorities relative to the history and development of maintenance and cure, we direct the interested reader to The Osceola, 189 U.S. 158 (1903) and Hall v. Noble Drilling (U.S.) Inc., 242 F.3d 582 (5th Cir. 2001).

[21]     The defendant also contends that the trial justice committed error when he instructed the jury with respect to cure, despite the fact that cure was not at issue in the case (see footnote 18, supra). However, as defendant concedes, the trial justice issued a corrective instruction. Accordingly, we perceive no error in the trial justice's instructions on the issue of cure. See Kurczy v. St. Joseph Veterans Association, Inc., 820 A.2d 929, 944 (R.I. 2003).

an excessive damages award, it is clear that the jury "misunderstood the law, the evidence, or both."[22]

In response, plaintiff posits that "as brief as [the unearned wages instruction] is, it is a correct statement of a straightforward law." He further contends that defendant should have produced a written agreement specifying the duration of Mr. King's employment if it wanted to contend that he was not entitled to unearned wages. Additionally, plaintiff claims that defendant should have requested "a special verdict form that segregates the elements of damages" in order to "preserve for appeal a challenge to separate components of a plaintiff's damage award." (Internal quotation marks omitted.) Lastly, plaintiff contends in his brief to this Court that, given the amount of the damages awarded, the jury "found pursuant to the [unearned wages] instruction an implied-in-fact contract."

It will be recalled that the instruction at issue in this case reads as follows:

> "If Mr. King is entitled to maintenance and cure, then you should also award him unearned wages from the date of Mr. King's injury until the end of the period for which * * * Huntress agreed he would work, that is, when he was serving the ship."

We shall evaluate that instruction in a de novo manner. Ros, 973 A.2d at 1166.

Our review of the relevant case law makes it abundantly clear that the unearned wages instruction given by the trial justice was erroneous. For vessels like the Persistence, which are "ocean going ships, the rule is said to be that wages are recoverable for the balance of the voyage * * * ." Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, ch. VI, § 6-12 at 309 (2d ed. 1975); see Vickers v. Tumey, 290 F.2d 426, 434 (5th Cir. 1961); Tavares, 33 R.I. at 437-38, 82 A. at 138; see also 1 Schoenbaum, § 6-28 at 506. However, it is possible for a

---

[22] The defendant makes a final argument that, as an alternative to granting a new trial, the trial justice should have granted its motion for a remittitur.

seaman and his or her employer to extend the period of recovery of unearned wages by contract.[23]  See Gilmore & Black, § 6-12 at 309; see also Nichols v. Barwick, 792 F.2d 1520, 1524 (11th Cir. 1986).  Such a contract would have to provide a definite right to employment for a fixed period of time.  See Farrell v. United States, 336 U.S. 511, 520 (1949) (holding that a seaman, injured while the vessel he worked on was docked, was not entitled to the one year worth of unearned wages that he was seeking because his employment contract provided only "for a term of time not exceeding 12 (Twelve) calendar months") (internal quotation marks omitted).  Accordingly, "[t]he period as to which unearned wages must be paid is determined by reference to the contractual relationship. When a seagoing employee has no contract or has a contract with no enforceable term of duration, she only is entitled to unearned wages from the time she becomes unfit for duty to the end of that voyage."[24]  Gheorghita v. Royal Caribbean

---

[23]  It should be noted that the period for which a seaman is entitled to recover unearned wages "differs from the period of entitlement to maintenance and cure."  Gheorghita v. Royal Caribbean Cruises, Ltd., 93 F. Supp. 2d 1237, 1243 (S.D. Fla. 2000); see Barnes v. Andover Co., L.P., 900 F.2d 630, 643 (3d Cir. 1990); see also 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 6-29 at 513 (5th ed. 2011).

[24]  The concept of unearned wages, which a seaman may be entitled to under a claim for maintenance and cure, differs greatly from the concept of lost wages which may be a part of the damages awarded if a seaman prevails on a claim for negligence under the Jones Act or breach of the duty of seaworthiness.  See LeBlanc v. B.G.T. Corp., 992 F.2d 394, 397 (1st Cir. 1993) (stating that maintenance and cure "is curative in nature and is thus to be distinguished from other admiralty rights, such as the right to recover lost wages or the right to recover for a shipowner's negligence, which are compensatory"); see also Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 592 (2d Cir. 1998) (holding that a "plaintiff may recover compensatory damages for lost income in Jones Act and unseaworthiness cases"); Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 452 (1st Cir. 1996).  While unearned wages are awardable only to the end of the voyage on which the seaman is injured or for the duration of his or her employment contract (if there is one), future lost wages could conceivably be recoverable under a negligence or breach of the duty of seaworthiness claim for the duration of a seaman's work life expectancy.  See Jones, 155 F.3d at 592.  The court in Vickers v. Tumey, 290 F.2d 426, 434-35 (5th Cir. 1961) explained the distinction as follows:

> "[A] classic element of damages in any personal injury claim where the standard of recovery is a pecuniary loss, is the inability,

Cruises, Ltd., 93 F. Supp. 2d 1237, 1243 (S.D. Fla. 2000); see Berg v. Fourth Shipmor Associates, 82 F.3d 307, 309 (9th Cir. 1996) (stating that a "vessel owner must pay unearned wages for a limited period," only "throughout the period of employment") (internal quotation marks omitted); see also Nichols, 792 F.2d at 1524 (holding that the plaintiff presented no evidence of a contract to work "until the end of the season" and, as such, was "entitled to wages only to the end of the voyage"); Vickers, 290 F.2d at 434 (stating that, "under the maritime doctrine of maintenance, wages and cure, wages * * * do not extend beyond the end of the voyage"). Thus, we hold that Mr. King was only entitled to recover unearned wages as part of his claim for maintenance and cure for either: (1) the duration of the voyage on which he was injured (which is not relevant here since the Persistence was docked when Mr. King's injury occurred); or (2) for the duration of an employment contract between Mr. King and defendant, if there was such a contract.

The plaintiff relies on Robinson v. Pocahontas, Inc., 477 F.2d 1048 (1st Cir. 1973), as support for the contention that unearned wages can be awarded to the end of the fishing season. (We infer from plaintiff's brief that he is contending that such wages can be awarded without an employment contract, as there was no evidence as to the existence of such a contract in the

---

or reduced ability, to earn wages. Consequently, in a seaman's action either under the Jones Act or maritime doctrine of unseaworthiness, a part of the recovery, if otherwise permissible, will be the loss of wages from the date of the injury down to the trial and, if established, the probable loss of wages in the future. * * * On the other hand, wages, in the maintenance-wages-cure sense is a very limited award. Perhaps offsetting its limited nature in terms of duration is the compensating feature that for an illness or injury suffered in the service of the ship, such wages are due as a matter of right wholly without regard to unseaworthiness or negligence or both."

instant case.) Robinson provides as follows: "[I]t has been settled that the right to recover wages through the end of the voyage or, as in this case, through the end of the fishing season * * * is a recognized element of a disabled seaman's claim for maintenance and cure." Id. at 1051. The opinion in Robinson is silent as to whether there was a contract between the plaintiff and the defendant which might have entitled him to unearned wages until the end of the fishing season; additionally, other than the just-quoted sentence, the Robinson opinion contains no further discussion of the issue. Id.

Importantly, in support of the just-quoted sentence, the Court in Robinson cited to Vitco v. Joncich, 130 F. Supp. 945 (S.D. Cal. 1955), which was affirmed by Joncich v. Vitco, 234 F.2d 161 (9th Cir. 1956). Robinson, 477 F.2d at 1051. The cited district court opinion in Vitco provides that "[a]long with the obligation to provide maintenance and cure, the maritime law attaches to the seaman's contract of employment the right to receive his agreed wages throughout the period of employment * * * which historically has meant to the end of the voyage, since the general custom in ships, other than the coastwise trade, is to sign on for a voyage rather than for a fixed period." Vitco, 130 F. Supp. at 949 (internal quotation marks omitted). The court in Vitco held that the seaman was entitled to unearned wages (or a share of the catch) until the end of the fishing season when, unlike in the instant case, there had been an oral invitation by the defendant to the plaintiff to join the crew for the tuna fishing season. Accordingly, we are not swayed by the passing reference to the fishing season in Robinson, especially given the clarity in federal maritime law with regard to when a seaman is entitled to unearned wages as part of a claim for maintenance and cure.

It is abundantly clear from a review of the testimony and evidence presented at trial in the instant case that at no relevant time was there an employment contract between Mr. King and

defendant. Mr. King himself testified that he would do "boat duty to follow the trip that [he] just finished and Kyle [Goodwin] would make the list out and determine who was going on that trip and who was going to stay on shore." Mr. Weisensee testified that the captain would decide who would go on each fishing trip and that the captain "pick[ed] who he fe[lt] deserve[d] to go;" he added that the composition of the crew was not the same from fishing trip to fishing trip. Moreover, JoAnn Greene testified that, during the years when Mr. King worked for defendant, he only went on "sixty-two and a half percent" of the Persistence's fishing trips. The plaintiff, who had the burden of proving that there was an employment agreement of a specified duration between defendant and him, did nothing to rebut that evidence. In fact, he did not enter a contract into evidence at all;[25] and, as defendant points out, "[p]erhaps more compelling, [when plaintiff testified, he] was never even asked about any such agreement by his attorney."[26] There was simply no evidence at trial that a contract existed between Mr. King and defendant; as such, in accordance with the applicable federal maritime law, Mr. King was not entitled to any unearned wages. See Farrell, 336 U.S. at 520-21.

We are of the opinion that the trial justice's jury instruction with respect to unearned wages was given in error in that it was an incomplete and insufficient statement of the law. The trial justice stated that, if the jury awarded maintenance and cure, it "should also award * * * unearned wages * * * when [Mr. King] was serving the ship." The trial justice was correct that plaintiff was entitled to be compensated under maintenance and cure for the duration

---

[25] We note that, in the course of the hearing on the parties' motions for a new trial, plaintiff's counsel acknowledged that "[t]he jury positively never had a contract" before it.

[26] It is further noteworthy that there was also no evidence presented at trial to support plaintiff's statement on appeal that the jury must have found that there was an implied-in-fact contract between him and defendant.

of his employment contract; i.e., when "he was serving the ship." However, the trial justice failed to explain that plaintiff was "serving the ship" only if he was on a voyage or had an employment contract for a specified duration. The lack of clarification of the jury instruction with respect to unearned wages illustrates the fact that the trial justice did not "fram[e] the issues in such a way that the instructions reasonably set forth all of the propositions of law * * * ." Morinville, 522 A.2d at 1222 (internal quotation marks omitted). It is further our view that, because the unearned wages jury instruction was somewhat ambiguous in the eyes of this Court, it is quite probable that it was even more so for the lay jurors. See Baccari, 741 A.2d at 264.

The fact that the incomplete jury instruction given by the trial justice with respect to unearned wages "misled" the jury is evident when one considers the jury award—the $257,500 jury award for maintenance and cure is simply not supported by the evidence. Botelho, 970 A.2d at 545 (internal quotation marks omitted). Since plaintiff was not entitled to unearned wages and the parties agreed that cure had already been paid, plaintiff was entitled only to compensation for his food and lodging from the date of his injury until his maximum medical recovery on March 9, 2010. Moreover, as plaintiff acknowledged, much of those maintenance expenses had already been paid by defendant. In fact, plaintiff's testimony reflects the fact that he was only seeking $37 per day for his mortgage and utilities and $15 a day for his food expenses from February of 2008 (when defendant stopped paying) until March 9, 2010. On the basis of this Court's rough calculations, that does not amount to a sum close to $257,500. Thus, there was no basis for the jury's award of $257,500 unless the jurors, incorrectly, took into account plaintiff's unearned wages.[27] Therefore, it is our decided opinion that the trial justice's erroneous jury instruction

---

[27] We deem it entirely possible that, when the unearned wages jury instruction is considered in the context of the entirety of the jury instructions, the jury did not properly fathom the distinction between the lost wages (on which there was testimony by Dr. Feldman) that it could

- 32 -

"misled" the jury "to the resultant prejudice" of defendant.  Id. (internal quotation marks omitted).  Accordingly, we remand this case for a new trial on plaintiff's claim for maintenance and cure.  See Baccari, 741 A.2d at 264.

**3**

**Maintenance and Cure—Motion for a New Trial**

Huntress, Inc., the defendant corporation, makes a further contention that, even if the jury instruction is found not to be in error, the trial justice nevertheless committed clear error in addressing defendant's motion for a new trial based on an excessive jury award; defendant avers that the trial justice failed to consider all of the material evidence and failed to even reference his jury instruction specifically.  It argues that, "had [the trial justice] conducted the correct analysis in light of the correct law, the excessiveness of the jury's award would have been evident."  The majority of the trial justice's decision on defendant's motion for a new trial was devoted to addressing the reasons why he was of the opinion that any challenge to the jury instruction concerning unearned wages was waived.  However, due to the fact that we have already determined that a new trial should be held on plaintiff's claim for maintenance and cure, we need not discuss whether the trial justice misconceived or overlooked material evidence or was otherwise clearly in error in the portion of his discussion which related to the jury's award on the claim of maintenance and cure.  See Botelho, 970 A.2d at 546.

---

have awarded had it found defendant to be negligent under the Jones Act or to have breached the warranty of seaworthiness and unearned wages under claims for maintenance and cure.  Cf. Ferrara, 99 F.3d at 452-53 (stating that "a district court's failure to acknowledge the three doctrines' substantive differences usually requires reversal").

- 33 -

**B**

**Counts Two and Three—Negligence under the Jones Act and Breach of the Warranty of Seaworthiness**

The defendant also contends that the trial justice erred in granting plaintiff's motion for a new trial with respect to Counts Two and Three—viz., negligence under the Jones Act (Count Two) and breach of the warranty of seaworthiness (Count Three). It posits that the trial justice inappropriately focused on the portions of the testimony of Mr. Weisensee which were not supportive of the jury verdict in defendant's favor—and, in so doing, overlooked the testimony of Mr. King and Mr. Reposa completely, as well as the portions of Mr. Weisensee's testimony which were supportive of the verdict in defendant's favor. The defendant additionally avers that the trial justice misconstrued the testimony on which he did rely and impermissibly considered portions of Mr. Weisensee's deposition testimony which were not read into the record at trial and, accordingly, were not before the jury. The defendant concludes its argument by stating: "[T]he trial evidence shows the error in the [trial] judge's decision. Not only could reasonable minds differ as to [Mr.] Weisensee's role in [Mr.] King's accident, the preponderance of the evidence overwhelmingly supported the jury's verdict for Huntress."

The plaintiff responds by contending that the trial justice thoroughly reviewed the evidence and, after a "meticulous evaluation," correctly concluded that plaintiff's motion for a new trial should have been granted. He states that the trial justice's "reasoning is clear and his assessment sound and should stand undisturbed."

Although we ultimately are able to resolve defendant's contentions largely on the basis of our existing jurisprudence with respect to motions for a new trial, we first deem it helpful to

briefly outline the legal principles which form the basis of claims for negligence under the Jones Act and breach of the warranty of seaworthiness.

The Jones Act created a statutory cause of action which provides that "[a] seaman injured in the course of employment * * * may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104(a). A seaman has a cause of action under the Jones Act if "an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy." Poulis-Minott v. Smith, 388 F.3d 354, 366 (1st Cir. 2004) (internal quotation marks omitted); see also Rannals v. Diamond Jo Casino, 265 F.3d 442, 447 (6th Cir. 2001). In contrast with claims for breach of the warranty of seaworthiness and ordinary negligence claims, under the Jones Act "[a] crew member's burden of proving causation is featherweight, meaning liability exists if the shipowner's negligence contributed even in the slightest to the injury." Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010) (internal quotation marks omitted); see Poulis-Minott, 388 F.3d at 366; see also Rannals, 265 F.3d at 447; Ribitzki v. Canmar Reading & Bates, Ltd. Partnership, 111 F.3d 658, 662 (9th Cir. 1997).[28]

Negligence under the Jones Act and breach of the warranty of seaworthiness "are separate theories of recovery that must be kept distinct," Rivera v. Herndon Marine Products, Inc., 895 S.W.2d 430, 434 (Tex. Ct. App. 1995), due to the fact that "unseaworthiness is a condition, and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it." Usner v.

---

[28] The reader interested in the history and development of the Jones Act would profit from perusing The Law of Admiralty by Grant Gilmore and Charles L. Black, Jr.—a superb piece of admiralty scholarship. See Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, §§ 6-20 to 6-27(a) at 325-54 (2d ed. 1975).

Luckenbach Overseas Corp., 400 U.S. 494, 498 (1971) (emphasis in original).  The United States

Supreme Court has "undeviatingly reflected an understanding that the owner's duty to furnish a

seaworthy ship is absolute and completely independent of his duty under the Jones Act to

exercise reasonable care."  Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960); see Poulis-

Minott, 388 F.3d at 366 ("Unseaworthiness is a cause of action that enforces the ship owner's

absolute duty to provide to every member of his crew a vessel and appurtenances reasonably fit

for their intended use.") (internal quotation marks omitted); see also Rivera, 895 S.W.2d at 434.

Accordingly, the question of seaworthiness of a vessel has been "complete[ly]

divorce[d] * * * from concepts of negligence."  Mitchell, 362 U.S. at 550.

Although the duty of the owner of a vessel is "absolute" with respect to breach of the

warranty of seaworthiness, Justice Stewart has eloquently noted as follows:

> "[I]t is a duty only to furnish a vessel and appurtenances
> reasonably fit for their intended use.  The standard is not
> perfection, but reasonable fitness; not a ship that will weather
> every conceivable storm or withstand every imaginable peril of the
> sea, but a vessel reasonably suitable for her intended service."
> Mitchell, 362 U.S. at 550; see also Ribitzki, 111 F.3d at 664.

Moreover, while it is not necessary to prove negligence in a cause of action for breach of the

warranty of seaworthiness, the seaman must prove that the "unseaworthy condition * * * is the

proximate cause of the injury sustained."  Poulis-Minott, 388 F.3d at 366.[29]

---

[29]    In Mitchell v. Trawler Racer, Inc., 362 U.S. 539 (1960), the United States Supreme Court
provided a detailed history of the warranty of seaworthiness from the earliest codifications of
"the law of the sea" in the "Laws of Oleron, promulgated about 1150 A.D. by Eleanor, Duchess
of Guienne," to the state of the law in the United States at the time when the Supreme Court was
formulating its opinion in Mitchell.  Id. at 543, 543-50.  In conducting our own research into the
law of admiralty (and its application to the instant case), we have encountered a wealth of
additional helpful scholarship relative to the issue of the warranty of seaworthiness.  See, e.g.,
Joel K. Goldstein, The Osceola and the Transformation of Maritime Personal Injury Law: Some
Propositions About the Case and its Propositions, 34 Rutgers L.J. 663 (2003); Risk Distribution

We acknowledge that the trial justice in the instant case, in reviewing plaintiff's motion for a new trial on his claims for negligence under the Jones Act and breach of the warranty of seaworthiness, adhered to the required steps of: (1) making an "independent appraisal" of the evidence; (2) assessing the credibility of the witnesses (at least those whose testimony he addressed) and "draw[ing] inferences" from that testimony; and (3) making an independent determination based on the evidence. Botelho, 970 A.2d at 545 (internal quotation marks omitted); see Rose, 85 A.3d at 622. However, even when a trial justice has adhered to the steps which our case law requires when dealing with a motion for a new trial, it is nonetheless our duty to vacate the decision on the motion if the trial justice misconceived or overlooked material evidence or "was otherwise clearly wrong." Botelho, 970 A.2d at 546 (internal quotation marks omitted). Our exacting review of the record and the decision of the trial justice wherein he granted plaintiff's motion for a new trial on his claims of negligence under the Jones Act and breach of the warranty of seaworthiness has led us to the conclusion that: (1) the trial justice in this case indeed misconceived and overlooked material evidence in reaching his decision; and (2) that decision was clearly wrong. Our several reasons for reaching that conclusion are detailed below.

We begin by noting that a review of the record indicates that defendant's contention that the trial justice relied on portions of the deposition testimony of Mr. Weisensee which were not in evidence at the trial is correct. In fact, plaintiff concedes that point in his brief to this Court, stating: "Without doubt the trial justice referred to a deposition that had not been before the

---

and Seaworthiness, 75 Yale L.J. 1174 (1966); LaVerne Evans, Maritime Personal Injuries and the Doctrine of Seaworthiness, A Matter of Status, 19 JAG J. 13 (1964).

jury * * * ."[30]  The plaintiff contends that the references by the trial justice are cumulative and, therefore, harmless.  In <u>Greensleeves, Inc. v. Smiley</u>, 68 A.3d 425, 435 (R.I. 2013), we indicated that "the trial justice's decision was clouded by references to matters outside of the record."  We went on to state:

> "It is well settled that error inheres in the action of a trial justice who * * * relies either in whole or in part on matters not in evidence. * * * However, such error is harmless and therefore not reversible if the trial justice relied on ample evidence independent

---

[30]  The trial justice's decision contains two incidents of reference to the testimony from Mr. Weisensee's deposition that was not before the jury.  The first occurs when the trial justice quotes as follows:

> "A: No, I didn't say anything about it.
> "Q: Why didn't you say anything?
> "A: We're in harm's way all the time. Somebody's doing something stupid, they're just being stupid. I don't really care. It's not my problem. Go hurt yourself. I don't care. It's not my problem.
> Weisensee deposition tr. September 17, 2010, page 19."

However, the portion of the deposition read into evidence at trial was as follows:

> "Question: Why didn't you say anything?
> "Answer: We're in harm's way all the time. Somebody's doing something stupid, they're just being stupid. I don't really care. It's not my problem. Go hurt yourself. I don't care. It's not my problem."

The second incident occurs in footnote two of the trial justice's decision, where the trial justice again references deposition testimony not before the jury:

> "During the deposition cross-examination, six weeks after the direct examination, Mr. W[e]isensee contends that Mr. King should have appreciated his own risk. Deposition of October 29, 2010 at page 44. Even if that were true, jury interrogatories 4 and 5 only dealt with whether the Huntress [sic] was unseaworthy or negligent. Mr. King's negligence, if any, was referenced in a later deposition. The responses to interrogatories 4 and 5 are therefore inconsistent with the evidence presented. Mr. Weisensee also suggests he did not see Mr. King go up the ladder which is blatantly contradictory to the testimony he gave weeks earlier."

- 38 -

of the references [to matters outside the record] to support [his] ultimate decision[.] * * * Therefore, we must determine whether the sum of the other evidence supporting the [trial] justice's decision indicates to us that his consideration of the [matters outside the record] was not an inextricable component of his analysis of the case." Id. (internal quotations marks omitted).

Ultimately we held in Greensleeves that, while it was "imprudent" for the trial justice to have relied on evidence outside the record, such reliance was "harmless" in that case. Id. In view of our reasoning in Greensleeves, plaintiff's argument that the trial justice's reliance on Mr. Weisensee's deposition testimony was harmless is not entirely without merit. However, even if the trial justice's references to the portions of Mr. Weisnesee's deposition testimony which were not presented to the jury at trial would not suffice in and of themselves to necessitate vacating the trial justice's decision, they do tend to suggest that his broader consideration of the evidence may also have been based upon inaccuracies—resulting in, as we discuss infra, the overlooking and mischaracterizing of material evidence by the trial justice and, consequently, clear error.[31]

It does not require an exhaustive review of the trial justice's decision to arrive at the ineluctable conclusion that he did, in fact, overlook and mischaracterize material evidence. In the course of ruling on plaintiff's motion for a new trial, the trial justice discussed only the testimony of Mr. Weisensee and Captain Grant Parker, with a passing reference to the testimony of Glenn Goodwin. The trial justice overlooked the material testimony of David Reposa, David

---

[31] We further point out that the trial justice stated in his decision that Mr. Weisensee's testimony was "worthy of extensive comment" due to the fact that he "was the only person in the fishhold with Mr. King at the time of the fall." However, this statement is inconsistent with other testimony in the record. David Webb, a deckhand on the Persistence, testified that he was "painting" in the "forward section" of the "fish hold" on the day in question and was "20 feet" away from plaintiff when he fell. (Emphasis added.) Moreover, Mr. Weisensee himself testified that "there were a couple of people down [in the fish hold] that day," and he answered in the affirmative when asked if a "Mr. Hay" was working with him in the fish hold on the date in question.

Webb, and plaintiff.[32] While a trial justice need not reference all of the evidence elicited at trial, he is required to reference enough for this Court to be satisfied that he applied the correct standard. See Panarello v. State, Department of Corrections, 88 A.3d 350, 373 (R.I. 2014) (stating that, whereas a trial justice is not required to "expressly reference every last bit of the evidence * * * [he or she] need only discuss sufficient evidence for it to be clear to this Court that the standard applied was appropriate"). In our judgment, by failing to consider the material testimony of the three above-mentioned witnesses, the trial justice failed to reference enough evidence for this Court to be satisfied that he applied the correct standard. See id.; Anderson v. Johnson, 59 R.I. 241, 247, 195 A. 240, 243 (1937) (holding that a trial justice erred when he, without "sufficient reason[,] * * * completely ignor[ed] the testimony of one group of interested witnesses, who were apparently believed by the jury, and in accepting the testimony of the other equally interested group, whom the jury did not believe").

In addition to overlooking the testimony of Mr. Reposa, Mr. Webb, and plaintiff, the trial justice, in rendering his decision, also critically overlooked portions of Mr. Weisensee's own testimony. The trial justice focused almost exclusively on the following statement made by Mr. Weisensee at his deposition and read into the record at trial:

---

[32] For example, the trial justice did not discuss the portions of plaintiff's testimony which reflected the fact that plaintiff did not think the stepladder was placed on a slant (although he acknowledged that the fish hold was "pretty rutted"). This testimony was particularly relevant in view of the consideration that (as defense counsel suggested in his cross-examination of Mr. King), if the stepladder was not placed on a slant, there was nothing wrong with the stepladder which Mr. Weisensee could have noticed and warned plaintiff about.

The trial justice also neglected to weigh the fact that, despite plaintiff's testimony that he was not carrying anything when he climbed the stepladder, Mr. Reposa testified that, when plaintiff went up the stepladder, he was carrying "his paint brush and his container * * * of paint." (Therefore, presumably, plaintiff could not have grasped the stepladder for balance.) The trial justice further ignored testimony by David Webb to the effect that he had "[m]any times" used without incident the same stepladder that Mr. King used on the date in question. Even these examples, which only scratch the surface of the overlooked testimony, tellingly illustrate the fact that the trial justice clearly erred in overlooking material evidence in this case.

"We're in harm's way all the time. Somebody's doing something stupid, they're just being stupid. I don't really care. It's not my problem. Go hurt yourself. I don't care. It's not my problem."

The trial justice used that statement by Mr. Weisensee, coupled with testimony by Captain Parker that stepladders were "inherently unsafe" on any vessel and that (in the words of the trial justice) "the standard of care among sea vessels is that each member of the crew is responsible for the safety of each other member," as predicates for his holding that Mr. Weisensee's failure to warn plaintiff of his slanted stepladder deviated from the standard of care. The trial justice further stated that, if Mr. Weisensee did not know of his duty to warn, then defendant deviated from the standard of care because Mr. Weisensee had been inadequately trained. It was consequently the opinion of the trial justice that he could not "conclude that the negligence count fails completely" and that "[t]o the extent Mr. Weisensee failed to warn and knew he should do so, Huntress was negligent." The trial justice determined that the jury's verdict was against the fair preponderance of the evidence and that "[r]easonable minds could not have come to the conclusion reached by the jury."

What the trial justice neglected to consider was contradictory testimony from Mr. Weisensee's own lips suggesting that he did not simply fail to warn plaintiff with respect to his slanted stepladder because he did not "care" or because it was not his "problem." To begin with, it was Mr. Weisensee's testimony at trial that he did not see plaintiff climb the stepladder after placing it on a slant and that he did not see plaintiff fall.[33] On direct examination at trial,

---

[33]    It should be recalled that Mr. Weisensee explained at trial that, although he had said in his deposition that plaintiff was on the second step of the stepladder when he fell, he had merely "assumed" that plaintiff was on the second step "based on how much time it took at the time." He clarified that statement during cross-examination when he testified that "two or three" seconds elapsed between the moment when he "glanced" over and saw plaintiff setting up his stepladder and plaintiff's eventual fall.

before a portion of his deposition testimony was read into the record, the following exchange occurred:

"[**Plaintiff Counsel**]: * * * [W]hat, if anything, did you say to [Mr. King] about straightening out the ladder?

"[**Mr. Weisensee**]: I never said anything to him about it.

"[**Plaintiff Counsel**]: Now, he was walking in harm's way and you said nothing?

"* * *

"[**Mr. Weisensee**]: I didn't realize he was in harm's way.

"* * *

"[**Mr. Weisensee**]: I said I didn't realize at the time that he was going to climb on it like that and fall down.

"* * *

"[**Plaintiff Counsel**]: Why was it that you didn't warn Mr. King?

"[**Mr. Weisensee**]: * * * I glanced up and I saw him setting up the ladder and to me the way it looked like he was setting it up, it didn't look like it was straight up and then I just glanced back just to do what I was doing. I was thinking to myself, you know, that's not really like you're not using your head but I didn't really feel like it was necessary to shout at him, 'hey, what are you doing', you know.

"[**Plaintiff Counsel**]: And that's because you thought he was being stupid?

"[**Mr. Weisensee**]: Well, I mean what do you mean? No, no.

"[**Plaintiff Counsel**]: And you thought what he was doing was stupid?

"* * *

"[**Mr. Weisensee**]: To set up a ladder slanted so it's not safe, it's not smart.

"[**Plaintiff Counsel**]: And you didn't care whether he was being stupid or not, correct?

"[**Mr. Weisensee**]: Not that I didn't care. I mean, I didn't realize that he was going to climb up and hurt himself.

"[**Plaintiff Counsel**]: And you didn't care whether he hurt himself when he was undertaking that task at that point, correct?

"[**Mr. Weisensee**]: I didn't realize that he was going to hurt himself.

"[**Plaintiff Counsel**]: But you didn't care?

"[**Mr. Weisensee**]: If he hurt himself? I don't know. It's on him, I guess, not me.

"[**Plaintiff Counsel**]: And it's not really your problem, is that what you're going to say?

"[**Mr. Weisensee**]: He's the one that has to deal with that; I mean, not really, no, but at the time it's not like I was thinking I'm not going to warn him because, you know, I don't care * * * ."

Immediately after the just-quoted exchange, the portion of Mr. Weisensee's deposition testimony which was relied on by the trial justice was read into the record. On cross-examination, Mr. Weisensee was asked: "At the time that you glanced at [Mr. King] when you turned to your right, did you know that Mr. King was going to climb the ladder while it was [slanted]?" He replied: "No, I just saw him setting it up. I didn't think that he -- I thought he would use his own sense and he would see what I saw, that it was slanted * * * ."

After an exhaustive review of the record in this case and particularly the testimony of Mr. Weisensee, it appears to us that Mr. Weisensee gave inconsistent testimony at trial and at his deposition regarding Mr. King's fall and why he did not warn Mr. King about the slanted stepladder. We have repeatedly held that "neither a witness's prior contradictory statements nor the inconsistencies in his testimony inhibit a fact finder's right to accept the witness as credible,

- 43 -

and to pick and choose from his testimony what portions he deems worthy of belief." Russian v. Lipet, 103 R.I. 461, 464, 238 A.2d 369, 371 (1968); see also Rhode Island Consumers' Council v. Smith, 111 R.I. 271, 295-96, 302 A.2d 757, 772 (1973); Madeira v. Pawtucket Housing Authority, 105 R.I. 511, 515, 253 A.2d 237, 239 (1969). Although a trial justice, in properly ruling on a motion for a new trial, must also assess the credibility of witnesses, the justice commits clear error when he or she completely overlooks testimony which is materially contradictory to the testimony on which the justice bases his or her determination. It is clear that the above-quoted testimony of Mr. Weisensee, which was inconsistent with the portion of the testimony on which the trial justice relied, was not referred to in the trial justice's decision. The only arguable reference comes in footnote two of the trial justice's decision, where he states as follows:

> "Mr. Weisensee also suggests he did not see Mr. King go up the ladder which is blatantly contradictory to the testimony he gave weeks earlier. Such self-serving statements lack credibility."

This statement serves to further illustrate the trial justice's error in not taking into account Mr. Weisensee's testimony about not knowing that Mr. King was going to climb the stepladder; the trial justice discussed only the portions of Mr. Weisensee's testimony that he deemed to be credible, overlooking the rest. In this Court's judgment, members of the jury, acting in their capacity as fact-finders, were well within their discretion to credit certain portions of the contradictory testimony of Mr. Weisensee, even if the portions which they chose to find credible differed from those that the trial justice was inclined to find credible. See Russian, 103 R.I. at 464, 238 A.2d at 371.

By ignoring testimony which did not support his determination, the trial justice in the instant case overlooked material evidence in finding that reasonable jurors could not differ and

that the verdict was against the fair preponderance of the evidence. In the situation presented in this case, where there was inconsistent testimony from a specific witness some of which the jurors could have found to be credible and some of which the trial justice found to be credible, one simply cannot say that reasonable minds could not differ on the outcome of the case; thus, it is our judgment that in this case reasonable minds could, and did, differ.[34] Accordingly, we hold that the trial justice committed clear error in granting plaintiff's motion for a new trial. See

---

[34] On June 30, 2011 (twenty-nine days after his June 1 decision on the motions for a new trial), the trial justice ruled on plaintiff's motion for judgment as a matter of law. See Super. R. Civ. P. 50. The plaintiff contended that he was entitled to judgment as a matter of law on Count Two (negligence under the Jones Act). In the course of denying plaintiff's motion, the trial justice stated:

> "Mr. King's motion relies on the testimony of Mr. Weisensee, who testified that he did not warn. However, Mr. Weisensee's credibility was very much in issue – which led to the admission of his deposition testimony. Mr. Weisensee was a key witness to the negligence. He claimed he saw the ladder leaning, saw Mr. King was about to fall and took no action. If his testimony is believed, Mr. King's case is strengthened. If it is discounted completely, Mr. King's case is not as clear. Reasonable jurors could have reached different conclusions concerning Mr. Weisensee's credibility and what actually happened as Mr. King climbed the ladder."

We recognize that the trial justice, in ruling on a motion for judgment as a matter of law (rather than a motion for a new trial), was not authorized to evaluate the credibility of the witnesses and was required to draw all inferences in favor of the nonmoving party. See Oliveira v. Jacobson, 846 A.2d 822, 829 (R.I. 2004). However, we note that the trial justice, when ruling on the motion for judgment as a matter of law, also did not reference Mr. Weisensee's testimony at trial which tended to suggest that he did not see Mr. King climb the stepladder and did not warn Mr. King about the slanted stepladder because he did not know that he was going to climb the stepladder and fall.

The trial justice's decision also emphasizes how crucial the credibility of Mr. Weisensee's inconsistent testimony was to this case. We have held that, in such situations, it is the prerogative of the fact-finder to "pick and choose" which testimony it deems to be believable. Russian v. Lipet, 103 R.I. 461, 464, 238 A.2d 369, 371 (1968). The trial justice is not free to disregard the decision of the jurors simply because he would find different portions of the inconsistent testimony to be credible.

Botelho, 970 A.2d at 545 ("If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions, the trial justice must allow the verdict to stand."); see also Bajakian, 880 A.2d at 851; Marcotte v. Harrison, 443 A.2d 1225, 1232 (R.I. 1982).

In addition to overlooking material evidence, the trial justice also misconceived the evidence on which he did rely. He interpreted the statement of Mr. Weisensee on which he relied—namely, Mr. Weisensee's deposition testimony that he did not care if a fellow crew member was injured—to mean that Mr. Weisensee, when he looked over and saw that Mr. King's stepladder was slanted, "appreciated the risk" and made a conscious choice not to warn Mr. King about the apparent danger. However, that conclusion required a large inferential leap on the part of the trial justice. The statement itself reflects nothing more than a general lack of concern for the safety of his fellow crew members; Mr. Weisensee did not specifically state, that, because he generally lacks concern for their safety, he deliberately failed to warn Mr. King on May 31, 2006 that his stepladder was on a "slant." Moreover, there is no testimony by Mr. Weisensee indicating that he knew that Mr. King would climb the stepladder and be at risk of injuring himself. It is clear to this Court that a jury could have heard the same statement as the one on which the trial justice relied and come to the conclusion that Mr. Weisensee did not knowingly opt not to warn Mr. King in this particular instance, leading us once again to the conclusion that reasonable minds could differ. See Botelho, 970 A.2d at 545. Accordingly, it is our opinion that the trial justice misconceived Mr. Weisensee's testimony.

One final point supports our conclusion—namely, that the trial justice's determination that Mr. Weisensee's breach of the duty to warn was a proximate cause of the harm (which determination was also extrapolated from the same just-discussed small portion of Mr.

- 46 -

Weisensee's deposition testimony on which the trial justice relied), was in error. Even though the threshold for proving proximate cause in a claim under the Jones Act is very low, the trial justice overlooked evidence that could indicate a different proximate cause for Mr. King's fall and injury. See Bielunas, 621 F.3d at 76. We refer to Mr. Reposa's testimony that plaintiff was climbing the stepladder while holding a paintbrush and a container of paint. Once again, depending on which testimony is deemed more credible, reasonable minds could certainly differ in determining what proximately caused Mr. King's fall. The varying testimony of Mr. Weisensee and the other witnesses at trial regarding the circumstances of plaintiff's fall leads us to conclude that the trial justice's determination that "Mr. Weisensee's reluctance to warn had significant ramifications which the jury failed to appreciate" was without support and, thus, was clearly erroneous.

In view of the just-discussed incidents where the trial justice overlooked or misconceived material evidence, it is clear to this Court that the trial justice committed clear error when he determined that the verdict was against the fair preponderance of the evidence and granted plaintiff's motion for a new trial on Counts Two and Three for negligence under the Jones Act and breach of the warranty of seaworthiness. Accordingly, we vacate the trial justice's decision in that regard.

### C

### Prejudgment Interest

The last issue which defendant raises on appeal is its contention that, in ruling about the prejudgment interest issue, the trial justice erred when he relied upon Rhode Island's prejudgment interest statute[35] as opposed to the pertinent principles of federal maritime law.

---

[35] General Laws 1956 § 9-21-10(a) reads as follows:

- 47 -

According to defendant, in an action based on federal maritime law, states may not apply their own substantive law when it is in conflict with substantive federal maritime law. The defendant contends that federal maritime law on prejudgment interest is substantive (not procedural) and that, therefore, the question of whether or not to award prejudgment interest (and how much, if any, to award) was one for the jury to determine. The defendant states: "[T]he trial judge's decision to apply * * * Rhode Island's prejudgment interest statute to plaintiff's award is * * * without precedent in any state or federal court." Additionally, defendant posits that it was improper for the trial justice to determine that <u>defendant</u> bore the burden of requesting that the question of whether or not to award prejudgment interest (and how much, if any, to award) be presented to the jury, rather than allocating that burden where defendant contends it belongs—namely, with plaintiff.

The plaintiff responds by contending that preemption (which is how plaintiff has chosen to characterize defendant's argument) is an affirmative defense—which defendant failed to plead and, consequently, may not raise now. He further contends that any issue with respect to prejudgment interest was waived by defendant because defendant failed to object before the jury left the courtroom to begin deliberations. Finally, plaintiff avers that federal maritime law leaves the awarding of prejudgment interest to the discretion of the trial justice.

---

"In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. Post-judgment interest shall be calculated at the rate of twelve percent (12%) per annum and accrue on both the principal amount of the judgment and the prejudgment interest entered therein. This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided."

In our judgment the following explanation of the concept of prejudgment interest is particularly well articulated:

> "If justice were immediate, there would never be an award of prejudgment interest.[] The injured party would receive an enforceable judgment immediately, with no loss in value from the time value of money. Because justice often takes many years to achieve, interest is added to the original judgment to ensure that compensation is complete.[] These calculations are ubiquitous, since the laws of most U.S. jurisdictions provide for interest on legal judgments from the time the claim arose until the date of judgment.[] Such interest is called prejudgment interest." Michael S. Knoll, A Primer on Prejudgment Interest, 75 Tex. L. Rev. 293, 294 (1996) (footnotes omitted).

The question before us with respect to prejudgment interest in the instant case is twofold. First, we must address whether or not the trial justice properly invoked Rhode Island statutory law relative to prejudgment interest or whether he should have applied federal maritime law. Second, (based on what will ultimately be our conclusion that the trial justice should have applied federal maritime law) we must address how the principles of federal maritime law with respect to prejudgment interest should have been applied in this case.

We begin our analysis with the question of whether state law or federal maritime law with respect to prejudgment interest should have been applied. The United States Supreme Court has held that the "savings to suitors clause,"[36] which gives state courts jurisdiction (albeit not exclusive jurisdiction) over a federal maritime claim, "allows state courts to entertain in personam maritime causes of action, but in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called reverse-Erie doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards." Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222-23 (1986) (internal

---

[36] The "savings to suitors clause" is set forth in 28 U.S.C. § 1333(1). See generally, Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, ch. I, § 1-13 at 37 (2d ed. 1975).

- 49 -

quotation marks omitted).  The United States Court of Appeals for the First Circuit likewise has stated: "It is well settled that by force of the Constitution itself, when a common law action is brought, whether in a state or in a federal court, to enforce a cause of action cognizable in admiralty, the substantive law to be applied is the same as would be applied in an admiralty court—that is, the general maritime law * * * ."  Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1052-53 (1st Cir. 1973); see also Carey v. Bahama Cruise Lines, 864 F.2d 201, 207 (1st Cir. 1988) (stating that states may not "modify or displace essential features of the substantive maritime law") (internal quotation marks omitted).  The principle which we draw from those cases is that, in an admiralty action in state court, issues which would be considered "substantive" are governed by federal maritime law.  Therefore, if prejudgment interest is a substantive issue, then the trial justice in the instant case was required to apply federal maritime law, rather than Rhode Island statutory law.

We find guidance in our own jurisprudence, which, while not directly on point, provides some enlightenment as we endeavor to determine whether prejudgment interest is a substantive issue.  In L.A. Ray Realty v. Town Council of Cumberland, 698 A.2d 202, 213-14 (R.I. 1997), this Court, applying federal law in an action based on 42 U.S.C. § 1983, stated that "federal courts in 42 U.S.C. § 1983 litigation generally view the availability of prejudgment interest as a question of federal law."  We proceeded to state as follows:

> "[S]tate law requirements may not be applied if their application would contravene the purpose of a federal law or policy, or if different outcomes would result depending on whether 42 U.S.C. § 1983 claims were brought in federal or state court, thereby thwarting the federal interest in uniformity. * * * Therefore, a state limitation on the availability of prejudgment interest may not be applied if such a limitation would contravene the goal of § 1983 to fully compensate the injured party."  L.A. Ray Realty, 698 A.2d at 214.

The concerns which we expressed in L.A. Ray Realty with respect to "the federal interest in uniformity" and the goals of state and federal law are also present in this case. Federal maritime law leaves the issue of whether to award prejudgment interest (and in what amount, if any) to the discretion of the fact-finder (see infra). In contrast, Rhode Island's statute with respect to prejudgment interest provides for the application of 12 percent interest by the clerk in any "civil action in which a verdict is rendered or a decision made for pecuniary damages;" it is a ministerial act which does not allow for any discretion by the judge or the jury. Section 9-21-10. Thus, applying state law in this context would result in "different outcomes"—depending on whether a particular federal admiralty action was brought in federal or state court. L.A. Ray Realty, 698 A.2d at 214; see Gilmore & Black, ch. I, § 1-17 at 48 ("[S]tate legislation is clearly invalid where it actually conflicts with the established general maritime law * * * ."); see also Carey, 864 F.2d at 207. The real possibility of such "different outcomes" indicates that prejudgment interest should be considered a substantive issue, in order to provide uniformity and prevent forum shopping. On that point, we are in agreement with the following statement by the Supreme Judicial Court of Massachusetts in reference to the issue of whether state or federal law should be applied in an admiralty case with respect to the awarding of prejudgment interest:

> "Maintaining disparate rules between the State and Federal courts * * * would foster inconsistent results on a substantive matter which often constitutes a considerable portion of the damages recovered. In turn, the guarantee of prejudgment interest to a successful plaintiff in a State court [as would be the case under Massachusetts state law] would encourage forum shopping." Militello v. Ann & Grace, Inc., 576 N.E.2d 675, 679 (Mass. 1991); see Hanna v. Plumer, 380 U.S. 460, 468 (1965) (discussing Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938) and stating that "the twin aims of the Erie rule [are] discouragement of forum-shopping and avoidance of inequitable administration of the laws.").

In addition to the application of state law resulting in a lack of uniformity and forum shopping, the goals of Rhode Island state law and federal maritime law with respect to awarding prejudgment interest are inconsistent; unlike the federal law, which leaves to the fact-finder the issue of whether or not prejudgment interest (and how much, if any, to award) is equitable in a particular case, one of the purposes of the Rhode Island state statute is to "encourag[e] the early settlement of claims." Martin v. Lumbermen's Mutual Casualty Co., 559 A.2d 1028, 1031 (R.I. 1989); see Pray v. Narragansett Improvement Co., 434 A.2d 923, 930 (R.I. 1981). For all of the foregoing reasons, this Court's precedent strongly suggests that prejudgment interest should be considered a substantive issue.

In addition, our review of federal case law and the case law from other jurisdictions clearly indicates that prejudgment interest has been considered to be a substantive issue by numerous courts. We first note that, although it has not specifically addressed prejudgment interest in the context of an admiralty action, we find some helpful guidance in the teachings of the United States Supreme Court; it has held that the "proper measure of damages is inseparably connected with the right of action," suggesting that any issues relating to damages are substantive. Chesapeake & Ohio Railway Co. v. Kelly, 241 U.S. 485, 491 (1916). The First Circuit has specifically held that any issue which affected the "amount of damages" was substantive and required the application of federal law. Robinson, 477 F.2d at 1053 (internal quotation marks omitted); see Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 741 (1st Cir. 1982) ("Because Count I of the complaint stated a cause of action arising under [a federal] Act, whether or not the trustee is entitled to prejudgment interest as an element of damages is a matter of federal law."). The Supreme Judicial Court of Massachusetts has similarly stated: "Federal and State courts agree that because it concerns a substantive remedy,[] the questions

whether to, and who may, award prejudgment interest are governed by the Federal maritime law and not State law." Militello, 576 N.E.2d at 678 (footnote omitted). Indeed, numerous scholarly writings have echoed the just-referenced holdings of the First Circuit and the Supreme Judicial Court of Massachusetts. See, e.g., Norman M. Stockman, Admiralty Law for the Land-Side Alabama Lawyer, 71 Ala. Law. 296, 303 (2010) ("[T]he availability of prejudgment interest is a matter of substantive admiralty law."); Michael F. Sturley & David C. Frederick, Prejudgment Interest in Seaman's Personal Injury Cases: Supreme Court Precedent Lost in a Sea of Procedural Confusion, 33 J. Mar. L. & Com. 423, 427 (2002) ("The awarding of prejudgment interest has long been held * * * to be part of the substantive law applied by the trial court * * * .").

After careful consideration of the state of the law with respect to prejudgment interest in an admiralty action, we now hold that in such an action prejudgment interest is a substantive issue. Accordingly, it was error for the trial justice to apply Rhode Island state law on such a substantive issue. The trial justice should have applied federal maritime law. In order to provide clarity with respect to this somewhat complicated issue, we proceed by discussing what federal maritime law demands with respect to prejudgment interest.

As the United States Supreme Court has recognized, "[t]hroughout our history, admiralty decrees have included provisions for prejudgment interest." City of Milwaukee v. Cement Division, National Gypsum Co., 515 U.S. 189, 194 (1995); see also The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 562-63 (1818) (augmenting the damages awarded by a lower court and directing that the additional funds bear prejudgment interest); Del Col v. Arnold, 3 U.S. (3 Dall.) 333, 334 (1796) (affirming a decree which provided for interest from "the day of capture"). However, as plaintiff recognizes, there is no consensus among the federal circuits as to the type of admiralty

cases which are eligible for the awarding of prejudgment interest, who is responsible for determining if prejudgment interest should be awarded, and who has the discretion to determine how much prejudgment interest is to be awarded. See 80 A.L.R. Fed. Recovery of Prejudgment Interest in Actions under the Federal Employers' Liability Act or Jones Act 185, § 11, § 15 at 217, 226 (1986) (recognizing that some courts allow prejudgment interest to be awarded in actions under the Jones Act and some do not); see, e.g., Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 593 (2d Cir. 1998) (stating that "pre-judgment interest should be awarded in admiralty cases absent exceptional circumstances"); Wyatt v. Penrod Drilling Co., 735 F.2d 951, 956 (5th Cir. 1984) (stating that prejudgment interest may not be awarded on a claim under the Jones Act, but may be awarded on a "maritime claim"); Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1053 (1st Cir. 1973) (holding that the jury has discretion as to whether or not to award prejudgment interest in an admiralty action); 2 Am.Jur.2d Admiralty § 215 at 694 (2004) (stating that "[a] court has discretion to award prejudgment interest in an admiralty case").[37] In our judgment, the United States Court of Appeals for the First Circuit articulated the most sensible approach in Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1052-53 (1st Cir. 1973), and it is that approach which this Court will follow.

In Robinson, the court was confronted with an action brought by an injured seaman against the company which chartered the vessel on which he was injured; the action was brought under the Jones Act and also included claims for "unseaworthiness and maintenance and cure under the general maritime law." Id. at 1049. The company that chartered the vessel argued on

---

[37] The lack of uniformity with respect to the awarding of prejudgment interest in a federal maritime action has been noted in admiralty scholarship. See, e.g., David Gray Douglas, The Current Status of the Availability of Prejudgment Interest in Admiralty, 17 Tul. Mar. L.J. 283, 283 (1993) ("[T]he federal circuit courts have developed different theories governing what types of awards can qualify for prejudgment interest and when such awards can be granted.").

appeal that the trial justice erred in awarding prejudgment interest to the plaintiff. Id. at 1052. After holding that federal law must be applied on the issue of prejudgment interest, the First Circuit proceeded to hold that prejudgment interest in a federal maritime action is properly left to the discretion of the jury. Id. at 1052-53; see also Cordero v. De Jesus-Mendez, 922 F.2d 11, 13 (1st Cir. 1990) ("There can be no doubt that in this circuit the decision to award prejudgment interest in a federal question case lies within the sole province and discretion of the jury."). Even though the plaintiff had included "demands for interest in his complaint," since the award of prejudgment interest was in the jury's discretion and "[the plaintiff] did not request that the jury be instructed that it might, in its discretion, add pre-judgment interest to its award," the court modified the trial justice's judgment by "striking out the award of pre-judgment interest." Robinson, 477 F.2d at 1053.

We further note that the holding of the Supreme Judicial Court of Massachusetts in its decision in Militello, 576 N.E.2d at 678-79, was substantially similar to the holding of the First Circuit in Robinson.[38] In Militello, the court held, that "in an action * * * in which both Jones Act and unseaworthiness claims are tried before a jury, the questions whether to award prejudgment interest, and at what rate, are to be decided by the jury." Id. at 678. The court further held that, "[b]ecause the plaintiff in this case did not correctly pursue prejudgment interest [in the form of a jury award], he may not now recover it." Id. at 679. We are in agreement with the holdings in Robinson and Militello.

---

[38] The plaintiff's attempt to distinguish Militello v. Ann & Grace, Inc., 576 N.E.2d 675, 679 (Mass. 1991), by arguing that in that case the defendant requested a jury instruction on prejudgment interest before the jury retired to deliberate is unavailing. The defendant in the instant case did not have the burden of requesting such a jury instruction; that burden was unquestionably plaintiff's.

The plaintiff avers that defendant, by not requesting a jury instruction until after the jurors left the courtroom to deliberate, thereby waived any contention that the issue of prejudgment interest should have been presented to the jury.[39] We find that assertion to fly in the face of both common sense and the foundational principles of our adversary system; requiring defendant to ask for a jury instruction which could ultimately lead to that same defendant being required to pay an even higher damages award to plaintiff is, in our estimation, more than quixotic; that approach would be utterly inconsistent with the traditional thesis-antithesis method which characterizes the Anglo-American litigation process. It was plaintiff who would have benefited from prejudgment interest on any jury award in his favor; it logically follows that it was plaintiff who was responsible for requesting a jury instruction with respect to prejudgment interest. Robinson, 477 F.2d at 1053.

Thus, in our judgment, the trial justice in the instant case erred in applying Rhode Island's prejudgment interest statute; under federal maritime law (which should have been applied), the issue of prejudgment interest is within the discretion of the jury and plaintiff bore the burden of requesting a jury instruction regarding prejudgment interest.

## IV

### Conclusion

In conclusion, we hold: (1) that the trial justice's unearned wages jury instruction, which was part of his instructions to the jury with respect to the plaintiff's claim for maintenance and cure, was erroneous and resulted in prejudice to the defendant; (2) that the trial justice

---

[39]    The plaintiff also argues, with respect to the issue of prejudgment interest, that preemption is an affirmative defense which defendant failed to plead and which is therefore waived. We respond to that argument by simply noting that preemption is not at issue in this case; we are instead concerned with a choice of law issue.

overlooked and misconceived material evidence in the course of granting the plaintiff's motion for a new trial on his claims for negligence under the Jones Act and breach of the warranty of seaworthiness; and (3) that the trial justice erred in applying Rhode Island's prejudgment interest statute, rather than following federal maritime law, which would have required the plaintiff to request an instruction whereby the issue of awarding prejudgment interest (<u>vel</u> <u>non</u>) would be submitted to the jury.

For the reasons set forth in this opinion, we vacate the trial justice's denial of the defendant's motion for a new trial with respect to the claim for maintenance and cure; we likewise vacate the trial justice's grant of the plaintiff's motion for a new trial on the claims of negligence under the Jones Act and breach of the warranty of seaworthiness. Additionally, we hold that the trial justice's reliance upon Rhode Island's prejudgment interest statute was in error. The record may be returned to the Superior Court with instructions that a new trial be conducted only on the claim for maintenance and cure.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     Jody King v. Huntress, Inc.

**CASE NO:**     No. 2011-341-Appeal.
No. 2012-202-Appeal.
No. 2012-203-Appeal.
(WC 08-415)

**COURT:**     Supreme Court

**DATE OPINION FILED:**  July 2, 2014

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice William P. Robinson

**SOURCE OF APPEAL:**     Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Jeffrey A. Lanphear

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Merlyn P. O'Keefe, Esq.

For Defendant:  Martin K. DeMagistris, Esq.